659 F.Supp. 363 (1987)
LITTLE ROCK SCHOOL DISTRICT, Plaintiff,
v.
PULASKI COUNTY SPECIAL SCHOOL DISTRICT NO. 1; North Little Rock School District; Arkansas State Board of Education; Wayne Hartsfield; Walter Turnbow; Harry A. Haines; Jim Dupree; Dr. Harry P. McDonald; Robert L. Newton; Alice L. Preston; Jeff Starling; Earle Love; Bob Lyon; John Ward; Judy Wear; Leon Barnes; Marianna Gosser; Steve Morley; Mac Faulkner; Bob Moore; Don Hindman; Shirley Lowery; Sheryl Dunn; David Sain; Bob Stender; Grainger Williams; Richard A. Giddings; George A. McCrary; Buddy Raines; and Dale Ward, Defendants,
Katherine Knight, Individually and as President of The Little Rock Classroom Teachers Association (LRCTA); LRCA; Ed Bullington, Individually and as President of The Pulaski Association of Classroom Teachers (PACT); Pact; John Harrison, Individually and as President of The North Little Rock Classroom Teachers Association (NLRCTA); NLRCTA; and Milton Jackson, Individually and as a Non-Certified Educational Support Employee of the Little Rock School District, Lorene Joshua, as next friend of minors Leslie Joshua, Stacy Joshua and Wayne Joshua; Rev. Robert Willingham; Sara Matthews, as next friend of Khayyam Davis, Alexa Armstrong and Karlos Armstrong; Mrs. Alvin Hudson, as next friend of Tatia Hudson; Mrs. Hilton Taylor, as next friend of Parsha Taylor, Hilton Taylor, Jr. and Brian Taylor; Rev. John M. Miles, as next friend of Janice Miles and Dereck Miles; Rev. Robert Willingham on behalf of and as President of the Little Rock Branch of the NAACP; Lorene Joshua on behalf of and as President of the North Little Rock Branch of NAACP, Intervenors.
No. LR-C-82-866.
United States District Court, E.D. Arkansas, W.D.
February 27, 1987.
Order March 4, 1987.
*364 P.A. Hollingsworth, Philip E. Kaplan, Janet L. Pulliam, John M. Bilheimer, Little Rock, Ark., for plaintiff.
*365 Wright, Lindsey & Jennings, Little Rock, Ark., Neal, Gerber & Eisenberg, Chicago, Ill., for Pulaski County Special School Dist., No. 1, Mac Faulkner, Bob Moore, Don Hindman, Shirley Lowery, Sheryl Dunn, David Sain and Bob Stender.
C.R. McNair, III, Asst. Atty. Gen., Sharon Streett, Dept. of Educ., Little Rock, Ark., for Arkansas State Bd. of Educ., Wayne Hartsfield, Walter Turnbow, Harry A. Haines, Jim Dupree, Dr. Harry P. McDonald, Robert L. Newton, Alice L. Preston, Jeff Starling and Earle Love.
Jack, Lyon & Jones, Little Rock, Ark., for North Little Rock School Dist., Bob Lyon, John Ward, Judy Wear, Leon Barnes, Marianna Gosser and Steve Morley.
Stephen L. Curry, Little Rock, Ark., for Grainger Williams, Richard A. Giddings, George A. McCrary, Buddy Raines and Dale Ward.
Theodore Shaw, New York City, John W. Walker, Little Rock, Ark., for intervenors Joshua, et al.
Richard Roachell, Cearley, Mitchell & Roachell, Little Rock, Ark., for intervenors Knight, et al.

INTERIM ORDER ENFORCING MANDATE OF COURT OF APPEALS
HENRY WOODS, District Judge.
In conformity with the opinion of the Court of Appeals dated November 7, 1985, 778 F.2d 404 (8th Cir.), and the ensuing mandate, a hearing was held on January 29-30, 1987, to consider the recommendation of the Magnet Review Committee concerning the locations, themes, dates, operation, transportation, seat allocations, targeted ratios, and administration of the magnet schools in this county. January 29th and 30th were devoted to testimony adduced by the Magnet Review Committee on behalf of its plan.
The hearing was adjourned to continue the week of February 17, 1987 a presentation of the magnet school plans of the other parties and a critique of the plan of the Magnet Review Committee. At the close of the testimony on January 30, I suggested that the parties again confer and attempt to reach an agreement on the magnet school portion of the Eighth Circuit mandate. (R. 568-69).
On February 17, 1987, the hearing was resumed to take up not only the magnet school issues but also the student assignment plans submitted by the Pulaski County Special School District (hereafter PCSD), the North Little Rock School District (hereafter NLRSD), and the Little Rock School District (hereafter LRSD). The three districts and the State Department of Education then advised the court that they had agreed by stipulation to a magnet school plan for the County which had been submitted to the Magnet Review Committee and approved by the latter. (R. 577). In open court the Joshua intervenors advised that they had no objections to the stipulation and were in general agreement with its terms. Since the Knight intervenors had not been party to the negotiations leading to the stipulation, they declined to approve the plan but interposed no objection thereto. I have examined the stipulation in detail. In my opinion it is an excellent compromise of the many complex issues involved in magnet schools. The stipulated settlement is in all respects approved. A copy of the stipulation is attached hereto as Exhibit A and is incorporated by reference in this order.
All of the parties except the Joshua and Knight intervenors have also stated in open court that the provisions of the Magnet Review Committee Report dated January 22, 1987 (MRC) not superseded by Exhibit A were stipulated as binding on the three districts and the State Board of Education. (R. 582-21). The Magnet Review Committee Report is attached hereto as Exhibit B. The stipulation and agreement as aforesaid are approved in all respects.
On behalf of all the parties, the attorney for the Little Rock District dictated into the record some minor supplemental understandings *366 in connection with Exhibit A. (R. 577). These understandings have been reduced to letter form and have been marked as Exhibit C to this order and are incorporated herein by reference. These understandings are approved as supplemental to Exhibit A.
One issue remains with reference to the magnet schools presently in existence. That is the question of whether the students presently at the three magnet schools should remain and finish at the schools which they have been attending. Based on the evidence presented, I am convinced that the past success of these schools is the best argument for continuing the present student body as much as possible. Involved parents, black and white, of children attending these schools have contributed greatly to their success and have invested a huge amount of time and energy in making these schools outstanding. It would be a mistake in my opinion to dump these students and start anew. There will of course be attrition and new seats available through graduation, but the students presently enrolled in Booker, Mann and Williams shall have a right to continue in these schools.
The responsibilities of the Magnet Review Committee, as agreed by the three districts and the State Board of Education, appear at pages 1 and 2 of Exhibit B hereto. The Committee shall be financed as agreed by the parties with a budget of One Hundred Fifty Thousand Dollars ($150,000) with Seventy-Five Thousand Dollars ($75,000) or half to be paid by the State and Twenty-Five Thousand Dollars ($25,000) by each of the three districts.
The MRC will necessarily work closely with the three districts and the State in order to have the six magnet schools ready for the 1987-88 school year. The MRC should report to the court on May 1, 1987, on July 1, 1987 and again on September 1, 1987 to inform the court of progress made in implementing the magnet schools. While the reports need not be lengthy, so as to be burdensome to the MRC, certainly the MRC reports should keep the court abreast of the status of critical aspects of implementation of the magnets including: renovations, teacher recruitment, staff training and development, community input and involvement, and student recruitment.
The Joshua intervenors and the Knight intervenors have both asked for representation on the Magnet Review Committee by a voting membership. I am unable to comply with this request. The Court of Appeals set forth in clear and unequivocal terms the makeup of the Magnet Review Committee. At the request of all the parties, I did give the Joshua intervenors a non-voting member of the Committee. This was a modification agreed upon by all the parties that did not affect the basic structure of the Magnet Review Committee. The request of the Joshua intervenors and the Knight intervenors for a voting representation on the Magnet Review Committee is hereby denied.
The financing of the magnet school plan has been stipulated; it is approved as covered in the stipulation (Exhibit A) and in the opinion of the Court of Appeals. In addition to the financing relating to magnet schools and to majority-to-minority transfers, there is only one other reference to state financing in the Court of Appeals decision, Little Rock School District v. Pulaski County Special School District, 778 F.2d 404, 435 (8th Cir.1985):
If the four all- or nearly all-black elementary schools as conditionally allowed by this Court in Clark v. Board of Education of Little Rock, 705 F.2d 265 (8th Cir.1983), are retained in LRSD, compensatory and remedial programs of the type that we required for the nonintegrated schools in St. Louis shall be put into effect for the four schools. See Liddell v. State of Missouri, 731 F.2d [1294] at 1312-18 [8th Cir.1984]. The additional cost of these programs shall be paid for by the State of Arkansas.
Since there are no all-black schools in the LRSD student assignment plan, the conditions are not present which would trigger state financing of compensatory education, as is obvious from the above language. The Little Rock District has requested other funding from the State. None of the *367 funding is required by the Court of Appeals ruling. The State's share of the magnet school funding will be considerable. It will strain the already meager resources of the State at a time when the State has committed itself to new standards for all Arkansas public schools. Although the blacks in Little Rock have suffered from the ravages of segregation, so have the blacks in every section and every county of the State. Significantly the new state standards provide for compensatory education for all students where performance is substandard. (State Exhibit MX 25).
The parties have agreed upon a system for handling majority-to-minority transfers. The stipulation setting forth this agreement, attached hereto as Exhibit D, is approved and is incorporated herein by reference. The three districts and the Joshua intervenors have also agreed upon a Pulaski County Education Cooperative for staff development, distribution of audio visual resources, "teacher center" activities, purchasing and other cooperative efforts of mutual benefit. The stipulation establishing the cooperative venture, attached hereto as Exhibit E, is approved.
After carefully considering the student assignment plan submitted by the PCSD, I have decided that it must be rejected for the reasons set forth in the record at pages 615-17. The district was given two weeks to submit an alternative plan. At the time the County's student assignment plan is considered, the court will deal with the other criticisms set forth by the Court of Appeals.
The broad outline of the student assignment plan submitted by the LRSD is hereby approved. Detailed assignments have been awaiting the resolution of the magnet school issues. The Little Rock District is hereby authorized to proceed with its student assignment plan as submitted to the court in March, 1986.
The North Little Rock School District was found to have purposefully committed a number of segregative acts, including the following which had an interdistrict effect: (a) failed to assign blacks to its central administration or to high school principalships and coaching positions; (b) concentrated whites in schools north of and blacks in schools south of Interstate 40; (c) assigned students to special education classifications on a discriminatory basis and (d) failed to apportion the burdens of transportation equally on black and white students. Little Rock School District v. Pulaski County, 584 F.Supp. 328, 353 (E.D.Ark. 1984). These findings were affirmed by the Court of Appeals. Little Rock School District v. Pulaski County Special School District, 778 F.2d 404, 422 (8th Cir.1985).
In March, 1986, the NLRSD submitted an implementation plan designed to remedy the interdistrict effects of its constitutional violations. (March plan). Subsequently, in October of 1986, the NLRSD submitted a supplement to its implementation plan (supplement plan) which addressed remediation of intradistrict impact of its prior segregative acts.
The NLRSD student assignment plan, the "Storm Plan," has been in effect for a number of years. When properly implemented, the Storm Plan provides for a constitutional student assignment system and for equitable busing burdens between blacks and whites. According to its March plan, all NLRSD schools are currently desegregated and deficiencies found by this court have been corrected. This evidence was uncontradicted at the June, 1986 hearing.
The NLRSD plan includes a detailed staff recruitment component which, if implemented, should result in substantial gains in the area of recruitment and promotion of blacks to positions where they are currently underrepresented. Supplementally the NLRSD has agreed to develop numerical goals and timetables for increasing the number of blacks to these positions. (Supplement plan 2.1).
Remediation of the unconstitutional over-representation of blacks in "special education" classes consumes most of the NLRSD's March implementation plan. As with the rest of its plan, if put into effect as proposed, the imbalance caused by the categorization of inordinate numbers of black students as "retarded" would be eliminated. NLRSD has suggested several *368 important monitoring procedures to insure compliance. (Supplement plan, 3.1).
The NLRSD supplement plan also addresses remedies for intradistrict segregative acts. In the area of compensatory education for black children who continue to suffer the trickle-down effects of past segregation, the NLRSD plan proposes an early childhood program. The program includes a testing process so that educationally disadvantaged children, both black and white, can be identified and targeted for help at an early age. For the early grades, that help will be provided through teacher aides who will provide one-to-one tutoring, through supplementary reading instruction, and through implementation of the State Minimum Performance Tests. Reading remediation will also be provided at the junior high school level, as will computer assisted instruction in basic skills with individualized programs.
The NLRSD supplement plan includes a number of programs aimed at the problem of students who leave school prematurely or "drop out." The excessively high dropout rate of blacks in the NLRSD is one of the most pressing problems for the blacks in that district. Proposed programs such as the WIN (We Intervene Now) and SAC (Student Assignment Class  which serves students who are suspended from their regular classes) are sound and should prove beneficial.
The violation relating to the disproportionate numbers of black students who are suspended or expelled for disciplinary reasons has largely been eliminated. For example, in the 1985-86 school year, 48% of the suspended students were black. While this percentage is somewhat higher than the actual percentage of black students enrolled (40%), the deviation is not so great as to indicate a continuing problem at this time. Expulsions are now infrequent (only 20 over the last three years) and are now made only by the board of education, after a hearing.
The NLRSD has made strides in improving the participation of black students in its Gifted and Talented program. The NLRSD supplement plan includes a number of safeguards to insure identification of black children who are gifted/talented but culturally disadvantaged. In addition to the screening tests which recognize cultural differences (i.e. System of Multicultural Pluralistic Assessment), the NLRSD now uses an identification process which involves nominations and recommendations based on multiple criteria from a number of people. The ultimate placement of a child in the program is a group decision. (Supplement plan 8.1-8.4).
In sum, the NLRSD has made great progress in each area where it was found to have been deficient. The NLRSD's March 1986 plan, as supplemented in October 1986, reflects a solid and workable approach, if implemented, to end segregation in that school district. The NLRSD plan is hereby approved in all respects.

ORDER
The Pulaski County Special School District (PCSSD) was found purposefully to have committed a number of segregative acts with an interdistrict effect: (a) failed to comply with a 1968 desegregation court order (Zinnamon v. Board of Education of the Pulaski County Arkansas Special School District, No. LR-CR-C-154); (b) constructed schools in locations which ensured that they would become racially identifiable; (c) failed to allocate the burden of busing equitably between black and white students; (d) failed to hire and promote black teachers and staff; (e) refused to allow deannexation to or consolidation with the North Little Rock School District (NLRSD) and the Little Rock School District (LRSD); (f) failed to assign students to schools in such a way as to maximize desegregation; (g) assigned students to special education classifications and gifted programs on a discriminatory basis; (h) assigned black principals to schools with high black enrollments; (i) created and maintained a racial imbalance in almost half its schools; (j) closed and downgraded schools in black neighborhoods and failed to build new schools there. Little Rock School District v. Pulaski Co. Special School District, 584 F.Supp. 328, 353 (E.D. Ark.1984). These findings were affirmed by the Court of Appeals. Little Rock *369 School District v. Pulaski County Special School District, 778 F.2d 404, 418 (8th Cir.1985).
Many of the violations have already been cured  either by court order or by affirmative actions of the PCSSD. The deannexation/consolidation violation has been cured by the redrawing of boundary lines which separate the districts. The failure to comply with Zinnamon includes the failure to appoint black members to the PCSSD board. By order of this court dated December 1, 1986, the PCSSD will now elect board members from zones. According to the plan submitted and approved, one of the zones will be majority black and another will be 40% black, 58% white and 2% other. This remedy supercedes that portion of Zinnamon dealing with black school board members. The ceding of the Granite Mountain area from LRSD to PCSSD includes the transfer of public housing areas to PCSSD. Moreover, there are apparently other public housing developments in the PCSSD. PCSSD Exhibits 18 and 20 in June, 1986 hearing. PCSSD has created a new position in the superintendent's office, the Coordinator of Housing and Integration. This staff person will, among other duties, relate to realtors, developers and planning agencies. PCSSD Exhibit R-2, p. 4. The PCSSD student assignment plan will soon be submitted and at that time the issues of desegregation in student assignments and equitable allocation of busing burdens will be addressed.
School site selection involves two separate violations. First, the construction of new schools where they are likely to be racially identifiable and second, the closing or downgrading of schools closest to centers of black population. Since this lawsuit was filed, the PCSSD board has adopted a policy making desegregation and equal access to school primary goals in decisions to build, renovate, or discontinue use of a school. PCSSD Implementation Plan, March 1986 (hereafter PCSSD Plan) Appendix B. The Coordinator of Housing and Integration obviously should have input into sites for proposed new construction. While no schools have been constructed during the pendency of this case, two new elementary schools are now proposed. The sites chosen conform to the board's new policy and are approved. In that same vein, progress has been made recently in improving the physical plants in schools such as Harris and Scott which were racially identifiably black.
The PCSSD has made continuous progress in hiring and promoting black faculty. An affirmative action plan was adopted by the PCSSD board in 1984, which has apparently been successful. As of November, 1985, 22.6% of the PCSSD teachers were black as compared with a 23.6% black student population. PCSSD Plan Appendix I. Further, the district has a goal to have black teachers make up 20-30% of the faculty in each school in the district. PCSSD Plan, Appendix I.
Similarly, the affirmative action plan for administrative staff appears to have been successful, although there remains under-representation in two specific categories: coordinators and directors. In spite of these specific areas which should be carefully monitored, the percentage of black administrators (24.7%) is good and indicates a positive step toward curing this deficiency.
The overrepresentation of blacks in special education classes can perhaps best be remedied through the use of culturally unbiased screening and subsequent monitoring. The PCSSD plan includes both of these elements. The result of the plan has been a marked drop in the percentage of blacks classified as requiring special education. PCSSD Plan, Appendix G. While the percentage of blacks designated for special education is 4.2% higher than the percentage of white children so designated, that deviation is within an acceptable range.
The PCSSD plan includes a commitment to assure black student participation in extracurricular activities. Notably, in the 1985-86 school year, black students comprised *370 28% of the membership in extracurricular activities. PCSSD plan, Appendix G. An affirmative recruitment plan will be implemented to remedy underrepresentation in activities where it occurs. PCSSD Plan, Appendix H.
The foregoing proposals of the PCSSD desegregation plan represent not only a turn in the right direction, but also significant progress toward achieving a unitary school district. While much remains to be done, much has been accomplished. Accordingly, this portion of the PCSSD desegregation plan is hereby approved.

EXHIBIT A

STIPULATION FOR RECOMMENDATIONS REGARDING MAGNET SCHOOLS
The undersigned parties have agreed to make the following described recommendation to the Magnet Review Committee for its consideration in formulating its recommendation regarding magnet schools.

LOCATIONS AND THEMES
The parties have agreed to recommend the following magnet school locations and programs:

School & Program Grade Target Enrollment
Carver  Basic Skills K-6 475
 Math-Science
Williams  Basic Skills K-6 530
Booker  Arts K-6 720
Gibbs  Foreign Language/ K-6 348
 International Studies
Mann  Math-Sciences/Arts 7-9 975
Parkview  Arts-Performing Arts 10-12 1150
Total 4198

The curriculum at magnet schools will emphasize the magnet theme and all magnet students must fully participate in magnet courses. As well as the magnet theme, all magnet schools will have strong academically-oriented curricula.
New magnets or expansion of magnets already existing may be provided for in subsequent school years beginning 1988-89 under the provisions of the Order of September 3, 1986. Any party may present applications for a magnet school or program not later than the beginning of each school year preceeding the proposed year of implementation. The Committee's decision and recommendation shall be submitted to the parties no later than November 15. The MRC shall make its recommendation to the Court not later than December 15.

IMPLEMENTATION
The parties propose that the District Court order the implementation of the six (6) aforementioned magnet schools for the 1987-1988 school year. The host district shall provide to the MRC and to the parties its implementation timetable at the time a magnet proposal is submitted to the Court.

FINANCING
The parties agree to the financing formulas proposed by the Magnet Review Committee at the hearing held on January 29 and 30, 1987. These formulas require the State to pay one-half (½) of the actual costs of the construction or renovation of magnet schools as well as the customary state aid and one-half (½) the cost of educating the magnet students attending those schools. It is understood that any district which does not provide a student to fill an allocated seat, and said seat is not occupied by any other student, will be required to pay to the host district as its full liability for said unfilled seat the per child cost of the host district's debt service payment, both principal and interest, for the construction or renovation of the schools in the magnet program. The host district will provide separate accounting and budgeting information regarding the magnet program to the Magnet Review Committee for review.

*371 INTERDISTRICT TRANSPORTATION PLAN
The State Board of Education remains committed to underwriting the entire actual cost of transporting magnet and M-to-M transfer students, which includes the cost of transporting these students for extra-curricular activities. The districts agree that transportation of magnet/M-to-M students should be performed utilizing measures which are most cost efficient. The interdistrict transportation plan shall not be used as a means to seek compensation for additional transportation vehicles unless such vehicles are directly necessary because of the interdistrict transportation plan. New full-sized school buses purchased in order to transport magnet/M-to-M students will be added to the total transportation fleet costs and applied on a pro rata basis to the transportation of magnet/M-to-M students. The cost of any other vehicles purchased to transport isolated magnet/M-to-M students will be prorated according to their actual use in transporting magnet/M-to-M students. Each district agrees to separately account for the costs of transporting magnet/M-to-M students and to make those records fully available to representatives of the State Department of Education at any reasonable time.
The parties agree that the Interdistrict Transportation Plan for both magnet schools and M-to-M transfers will be administered by an Interdistrict Transportation Authority (ITA). The ITA shall be composed of the Transportation Director or other designee of each district and a representative of the State. The parties agree that any conflict may be determined by a U.S. Magistrate acting as a Special Master for the District Court.

SEAT ALLOCATION
All magnet schools shall have a student population which is fifty percent (50%) black and fifty percent (50%) non-black. The parties agree that for the 1987-88 school year the magnet school seats shall be allocated according to the following formula: Twenty-five per centum (25%) of the capacity of a magnet school shall be reserved for the shadow area in the host district. The remaining seventy-five per centum (75%) of the seats shall be allocated to each of the three districts in proportion to that district's percentage of county-wide students at each school level (elementary, junior high, or senior high). At the elementary level each district shall allocate its seats in proportion to the racial ratio present in such district at the elementary level. At the secondary level, each district shall allocate all its seats on the basis of 50% black, 50% non-black. However, the total number of seats assigned to the North Little Rock School District shall not exceed 475 seats with no more than 100 seats being allocated to the North Little Rock School District from Parkview.
It is understood that seat allocations will not be made by district to a particular school, but only by elementary, junior high and senior high level. Therefore, a particular district will be permitted to use its allocated seats in accordance with the desires of its students subject to space limitations in particular magnet schools and the maintenance of a 50-50 racial balance. If there is oversubscription among the districts by race, grade or school each district may make a recommendation to the MRC for its approval regarding actual distribution of seats. The three districts agree that each district will establish an open enrollment policy for magnet schools and will be permitted to determine how children will be selected for the magnet seats allocated to each district pursuant to that policy. This provision shall not prohibit the establishment of geographic preference areas where appropriate.
In the event there are unused seats by any district then persons on waiting lists to attend from the other districts shall be permitted to attend before any seat is left vacant. No student attending a magnet school will be considered as an M-to-M transfer student for incentive payment purposes.

TARGETED RATIOS
The parties have previously submitted to the Court a proposed stipulation for M-to-M *372 transfers which in part recognizes that if M-to-M transfers occur, ratios targeted by any of the districts for particular schools might be affected depending upon the locations from which M-to-M transfers occur. The parties in that stipulation agreed that the first priority should be a successful M-to-M transfer program and that if it did affect targeted ratios, such departures would not be regarded or urged as constitutional violations or departures from desegregation plans. The parties further recognize that a successful operation of the magnet school program could potentially have the same or similar effects upon targeted ratios. The parties therefore recommend that any magnet transfers not be counted as a departure from a desegregation plan or urged as a constitutional violation.

LITTLE ROCK MAGNET GRANT
The parties agree and recommend that, should the Little Rock District now or in the future prove successful in obtaining grants for the operation of magnet schools, any such monies shall be applied off the top to the obligations of all parties. The parties further agree and recommend to the Court that they cooperate in the development of an application for any future magnet grants.

ADMINISTRATION
The daily administration and operation of the magnet schools shall be the responsibility of the host district. The host district shall designate a person who shall have principal responsibility for overseeing the development and implementation of its magnet program.

STUDENT RECRUITMENT
The parties agree that the Magnet Review Committee shall establish a Magnet/M-to-M Educational Team (MET). The major responsibilities of the MET shall include community education and information dissemination of educational opportunities in the magnet programs and recruitment for both magnets and M to M transfers. It shall report to the MRC. The MET shall be composed of the person from each school district and the State responsible for desegregation planning, and two additional persons selected by each of the following parties:
 Joshua Intervenors
 Little Rock School District
 North Little Rock School District
 Pulaski County Special School District
 State of Arkansas
These additional representatives of the MET shall not be employees or officials of any of the districts or the State.
 February 16, 1987
 PCSSD Administrative Offices
The Magnet Review Committee (MRC) endorses the foregoing stipulations. Pulaski County Special School District
/s/ Gene Jones 
North Little Rock School District
/s/ James R. Smith 
Little Rock School District
/s/ Jesse L. Rancifer 
Arkansas Department of Education
/s/ Marcia A. Harding 
Arkansas Department of Education
/s/ Morris F. Holmes 

EXHIBIT B

MAGNET REVIEW COMMITTEE REPORT TO THE COURT

January 22, 1987
The Honorable Henry Woods
U.S. Federal District Court
Eastern District of Arkansas
P.O. Box 3683
Little Rock, Arkansas 72203
Dear Judge Woods:
The Magnet Review Committee submits for your consideration the attached report including nine separate recommendations concerning magnet schools in Pulaski County.
*373 The committee is prepared to present the report orally with supporting information as you may direct.
 Sincerely,
 /s/ Gene Jones
 Gene Jones, Chairman
 Pulaski County Special School
 District
 /s/ Morris F. Holmes
 Morris Holmes
 Arkansas Department of Education
 /s/ Marcia A. Harding
 Marcia Harding
 Arkansas Department of Education
 (See Attached Minority Report)
 /s/ Jesse Rancifer
 Jesse Rancifer
 Little Rock School District
 /s/ James R. Smith
 James Smith
 North Little Rock School District

I. INTRODUCTION
The Magnet Review Committee (MRC) has been charged by the District Court with "planning an interdistrict magnet school program." The MRC's duties and responsibilities set forth in the Court's order include:
· considering plans and proposals for magnet schools submitted by the parties and hearing evidence in relation thereto;
· developing interim proposals for consideration by the parties;
· evaluating segregative and desegregative effects of magnet school proposals;
· making findings and recommendations to the court concerning the number, location, staffing, racial ratios, and themes of magnet schools;
· making recommendations as may be necessary to the efficient operation and administration of magnet schools;
· monitoring, evaluating and recommending changes in the actual operation of the magnet schools implemented; and
· making an annual report to the court pertaining to the approved interdistrict magnet school programs.
The court directed that this report with the MRC's recommendations be submitted on or before January 22, 1987. This document addresses that charge. The report is organized into the following major areas: I. Introduction; II. Activities of the Magnet Review Committee; and III. Recommendations.

II. ACTIVITIES OF THE MAGNET REVIEW COMMITTEE (MRC)
Parties appointed representatives to the MRC as directed by the Court. Currently those serving on the MRC are:
Mr. Gene Jones (White), Chairman, Pulaski County Special School District
Dr. Reginald Avery, Ex-Officio (Black), Vice-Chairman, Joshua Intervenors
Ms. Marcia Harding (White), Arkansas Department of Education
Dr. Morris Holmes (Black), Arkansas Department of Education
Dr. Jesse Rancifer (Black), Little Rock School District
Mr. James Smith (White), North Little Rock School District
The MRC first met on September 24, 1986 and agreed to meet weekly at sites to be determined at each meeting. The Committee also agreed to and held additional meetings as they became necessary. At the September 24 meeting, the MRC organized itself into a working group and began developing the rules and procedures that would govern its mission.
Under the rules and procedures developed by the Committee, the following activities were conducted:
· The MRC considered all plans and proposals that were submitted for magnet schools by the parties represented on the Committee.
· The MRC heard evidence and considered the views presented by the parties represented on the Committee.
*374 · The MRC evaluated both the segregative and desegregative effects of all proposals for magnet schools.
· The MRC reviewed demographic data on each district.
· The MRC secured consultative assistance from Dr. Bennat Mullen, Director of the Technical Assistance of the Southwest.
· The MRC visited the Williams Magnet School, the Mann Science Magnet School, and the Booker Arts Magnet School, all located in the Little Rock School District. At each school, a discussion of the school's philosophy, goals and objectives was conducted with the principal and various staff.
· The MRC reviewed considerable research and information on magnet schools and added to this knowledge by visiting magnet schools in Cincinnatti, Ohio, and St. Louis, Missouri. Both visits provided valuable insight on the operation of magnet schools.
The Arkansas Department of Education has exercised a positive leadership role in all activities of the Magnet Review Committee. ADE Director Tommy Venters and his staff developed thoughtful proposals which had a major impact on the Committee's recommendation. Additionally, The Department allowed Dr. Angelo Coppola to work full time for the Committee doing valuable research and data gathering.

III. RECOMMENDATIONS

A. Magnet Review Committee Organization

1. General Organization
Membership and general responsibilities have been outlined for the MRC in the District Court order. The MRC believes this order sufficient to address the membership issue and recommends that each party retain discretion in appointing its representatives on the MRC. The MRC has proven itself capable of handling the additional organizational aspects of the Committee's work and will continue to do so in the future.

2. Staffing and Funding
Efficient and effective operation of the Magnet Review Committee is critical to the success of desegregating the public schools of Pulaski County, Arkansas. In order to function effectively, the MRC recommends it have a staff consisting of at least two staff members  one professional and one support. In addition to a staff, the Magnet Review Committee requires an operating budget consisting of funds for an office, equipment, travel, staff and consultative services. Consultative services will be critical to data gathering, program monitoring, evaluation and preparation of annual reports to the Court. A budget within a range of $100,000 to $150,000 will be needed, with 50 percent of the cost being borne by the State and the remaining 50 percent being shared by the three school districts.

B. Costs and Funding

1. Accounting and Budgeting:
The Magnet Review Committee recommends that separate accounting and budgeting procedures for approved magnet programs be maintained by the district(s) hosting each of the programs and that magnet program budgets receive prior review by the Magnet Review Committee.

2. Construction/Renovations:
In accordance with the Eighth Circuit order the State shall pay 50 percent of construction and renovation of approved magnet schools. The remaining 50 percent shall be paid by the participating districts (See Attachment A, pg. 26).
The recommendations on actual allocation and payments are as follows. The State shall pay its 50 percent allocation in quarterly payments upon actual expenditures for renovation and remodeling of approved magnet schools. The host school shall be responsible for the bond issue and payment of the remaining 50 percent since the ownership and management shall stay with that host school. The two remaining districts shall pay their prorated share by the inclusion of debt service payment, both principal and interest, in figuring the cost *375 per child for those children participating from their respective districts.
In the event that allocated seats are not filled by any district, the district to which that seat was allocated shall pay the host school the per child cost of their debt service payment, both principal and interest.
Since the State would have met its obligation up front there will be no debt service payment of principal and interest figured into the State's 50 percent cost per child for operation of magnet schools.
It is recommended that the State be a full partner in all phases of construction and renovation, from selection of the architect to final approval.

3. Operating Costs:
The Magnet Review Committee recommends funding the operating costs for the approved interdistrict magnet programs as outlined in Attachment B, pgs. 27-32. The figures used for examples were determined using 1986-87 school year data. This data will change with the change in local wealth, increase or decrease in WADM, and increase or decrease in State funding.
In compliance with the Eighth Circuit order, the State will pay to each district the table rate that each respective district qualifies for that school year. In addition to the table rate (Customary State Aid) per District, the state will pay 50 percent of the cost per student for operation of the magnet schools less the transportation cost and debt service cost. As a result, those students attending magnet schools will not be counted in any District's WADM for aid.

C. Interdistrict Magnet Programs Staffing

The men and women selected to staff each of the magnet programs are responsible and accountable for assuring parents and the community that quality exists in both the process and product of schooling. The staff's performance should evidence their beliefs that all children can learn, that the school makes a difference, and that a desegregated school environment has positive effects on the schooling and lives of students.

1. Staff Composition
The staff should be composed of appropriately certified and otherwise highly qualified educators. The MRC recommends that the staff represent a 50-50 ratio of Black to White administrators and teachers. If such a ratio is not possible to attain at the time the magnet programs open, a goal should be set to achieve the ratio within a reasonable time frame.
To help ensure interdistrict and community ownership and support, effort should be taken to attract administrators and teachers from the three school districts.

2. Staff Selection
The actual selection, hiring and evaluation of the magnet program staff is the responsibility of the district operating the magnet program. However, the MRC will assist with the development of criteria for staff selection, as well as monitor and evaluate magnet school program effects on student learning and desegregation.

D. Community Participation

The Magnet Review Committee advocates that the community should participate in planning and developing interdistrict magnet programs developed after the initial year of desegregation. We therefore recommend that a community-school partnership model be adopted by the districts in accomplishing the continuing work of the magnet schools. Such a model would include the following components:

1. Awareness Campaign
Awareness activities are necessary to:
a. Establish within the community and schools a sense of the need for a partnership;
b. stimulate interest in the community-school partnership; and
c. motivate involvement in such a partnership.

2. Public Education Campaign
The community must be provided with a base of information about educational equity *376 and excellence in a desegregated environment and about the issues in this case. Such information should include, but not be limited to, the following:
a. History of desegregation efforts in this community
b. Impacts/effects of court rulings and desegregation plans
c. Explanation of how the community-school partnership works in planning and implementing desegregation
d. Orientation to issues related to educational equity

3. Needs Assessment
It is important to identify needs and decide upon priorities among them. Such a process should be utilized to ensure that citizens and educators have the opportunity to participate in quality education planning.

4. System for Processing Input
A system must exist for acting upon community input to planning. This is necessary to any sincere effort to establish and maintain community involvement and support for educational equity and excellence in a desegregated environment. The following process is an example of a system which encompasses this aim.
a. Any individual or group is encouraged to submit ideas to the district aimed at affecting educational equity including, but not necessarily limited to, ideas for magnet schools and specialty programs.
b. The district sorts and channels the ideas(s) to appropriate group(s) for consideration.
c. The designated group(s) does the following:
(1) Analyzes the ideas
(2) Makes a recommendation (develop, postpone, reject)
(3) Corresponds with the author regarding the decision
d. If the idea is supported, broader community comment is solicited to determine the public's reaction to the proposed idea. The method previously described to involve the community can be applied here.
e. If support is apparent, individuals are identified to more fully develop the concept into a proposal, which is then shared with the school board.
f. The district plans and holds public hearings on the proposal following a period of publicity to stimulate public interest.
g. The School Board considers the community reactions and recommendations in decisionmaking on the proposal.
h. If approved by the Board, the program is readied by the district staff, publicized as appropriate, and implemented.
i. As part of the evaluation of each program's effectiveness relative to educational equity and excellence in a desegregated environment, parent/community satisfaction should be assessed and considered before modifications are made.
With minimal modifications, a system of this type will work equally as well at the building level (for school-based management) as at the district-wide level.
Additionally, when a proposal is made for the establishment or modification of an approved magnet school program, steps would be included to provide for the proposal to be brought before the Magnet Review Committee for consideration and endorsement.

E. Transportation

In fulfilling its responsibility to provide, either directly or indirectly, the magnet program students with transportation, the MRC recommends that the State keep in mind two primary considerations, these being:
1. delivery of magnet school students to their designated schools in a safe, orderly and expedient manner; and
2. cost efficiency.

*377 F. Student Enrollment Guidelines

1. Racial Ratios
The Magnet Review Committee recommends that a 50-50 Black to White ratio be used for magnet program enrollment.

2. Seat Allocation
The Committee further recommends reserving the first 25 percent of the seats in each magnet school for students in the host district who live in the shadow of the school.
The remaining 75 percent of the seats in magnet schools should be allocated to the three districts on the proportional formula based on the percentage of each race residing in the affected district. The formula will be revised to maintain the mandated 50-50 ratio.

3. Existing Magnet Programs
The Committee recommends that students presently attending existing magnet schools should be allowed to continue in those schools as appropriate, but that seats in incoming grades and seats vacated by attrition be allocated to North Little Rock School District and Pulaski County Special School District on the interdistrict formula described above.

G. Interdistrict Magnet School Programs

The MRC recommends that six schools in the Little Rock School District become approved magnets. This proposal incorporates the continuation of the three magnet schools currently in existence and suggests the addition of Carver, Dunbar, and Gibbs. A total of 3,722 students can be educated in the interdistrict magnet programs recommended.
In this section of the report, the MRC's rationale for the inclusion of each proposed school is discussed.

1) Williams Magnet School (K-6)
The Little Rock School District has recommended the continuation of Williams as a "basic skills" magnet school for elementary students. As presently operated, Williams has continued to attract students since 1982. The waiting list of children whose parents would like to have them attend Williams now stands at 396, indicating much interest in the school and its program. We recommend the continuation of the Williams Magnet School. We also recommend that those characteristics which appear to have made the program a success be carefully studied prior to making any changes. The Magnet Review Committee, in conducting its monitoring and evaluation activities, will monitor practices such as ability grouping relative to possible segregative and desegregative effects.

2) Booker Arts Magnet (K-6)
Booker is also recommended for continuation as an elementary arts magnet. Because it appears to be a highly successful program, the MRC recommends its continuation. The $916,000 estimated by Little Rock for construction and renovation of Booker appears to be too high. We believe that the projects proposed for these funds could be done for less money. This issue is addressed in more detail in the section of the report which deals with construction and renovation costs.

3) Mann Junior High Arts and Sciences Magnet (7-9)
The Mann program has entered its fourth year with a science magnet program which is a "school within a school," serving approximately 300 students in grades 7-9. Making the entire school a junior high science magnet next year has been considered. However, its waiting list consists of only eight students, hardly enough, even when combined with students from Pulaski County and North Little Rock to fill the school with over 1,100 junior high students all eager to study the sciences.
The MRC recommends instead that Mann Junior High School become an "arts and sciences" magnet. To combine these themes within one magnet school would accomplish several objectives. First, it would bring together junior high students *378 with strong interests and/or aptitude in two major areas but who may not yet be either willing or ready to narrow their choices entirely to one field or the other. For elementary students interested in the arts, it would provide a natural extension for children now attending Booker, but it would also help to expand, rather than narrow, students' participation in other fields of knowledge. It would accommodate the present math/science program (300 students) as well as the number of students who presumably would have gone to East Side under another proposal. It would be far less expensive than renovating East Side. It has an auditorium with a seating capacity of 1,100 and a gymnasium which could be useful for various arts activities as well as science presentations and exhibits. It is closely located to Booker and the Arts Center, thus providing opportunities to both schools to utilize consultants, artists in residence, craftsmen, and performers. We support the continuation of Mann as a magnet school. However, we believe that students interested in both the arts and sciences could be accommodated there.

4) Carver Math and Science Magnet (K-6)
The Little Rock District contends that Carver should become a magnet school because it will be impossible to desegregate the school otherwise. It proposes to tear down the present structure and relocate it on other land somewhere in the neighborhood that has not yet been purchased. Carver is said to be improperly located on its present school site, and the playground particularly difficult to maintain because of neighborhood vandalism.
Little Rock has proposed that Carver become a "basic skills" school similar to Williams, though without the dress code and without ability grouping. The District views the "basic skills" theme as one particularly likely to generate parent support. The MRC agrees that the basic skills theme is likely to generate support, but we also believe that a basic skills program which emphasizes mathematics and science would enhance this school. In recommending Carver as a magnet, the MRC advises caution in changing characteristics which appear to have made the other basic skills program a success.
We envision a science program at Carver which would not only enable youngsters to study the sciences through hands-on laboratory experiences but would also enable them to take part in such national competitions as Invent America, a program which encourages creativity and problem solving in the development of new inventions and the uses of technology. Carver could also host science fairs and exhibits for other students in the area, as well as throughout the State, and could serve as a model for other districts in Arkansas.

5) Dunbar International Education Complex (K-9)
In order to provide more magnet choices for parents and students at an affordable cost, the MRC recommends that Dunbar and Gibbs (which are located adjacent to each other) become a magnet school complex with an international studies and global cultures theme.
Gibbs would provide the elementary (K-6) program and Dunbar would provide the junior high (7-9) program. We believe this magnet program holds excellent promise for offering an educational program that truly prepares youngsters for life and work in the twenty-first century. Such preparation means, in large measure, preparing a populace who can understand, interact with, and appreciate people representing many different cultures. A school experience that provides opportunities for growth, development, and understanding in these areas will be crucial for our continued success in the world. We must educate young people who can function effectively as the citizens our country must have in the "global village" in which we live.
Included in the K-9 curriculum at the Dunbar International Education Complex would be foreign languages, technology, multi-cultural studies, international relations, geography, government, and law. Students would be involved in cross-age *379 grouping and multi-disciplinary studies and would have opportunities to learn within their own miniature "global village," consisting of the two campuses. They would learn about the operation of government through functioning in a "micro-society" which would require their full participation. Student exchange programs would be encouraged. Teachers would also be exchanged among schools to provide specialized educational opportunities for students of different ages. Satellite instruction would bring programs to the schools from throughout the country. School "walls" would be minimized as students participated in "community" activities intended to strengthen and enhance the culture of the school and community and their understanding and appreciation of individual differences among themselves. These schools would establish linkages with the UALR Visitor Center, the business community, UCA, and the city's international community. The Complex could host "Academic Olympics" for other schools throughout the State. It would serve as an educational model for other schools in the State, showing how schools could be structured in such a way as to prepare youngsters for effective and intelligent participation in local, national, and world communities.
Benefits to be derived from the Dunbar International Education Complex are as follows:
(a) A continuous program in grades K-9 would be provided with themes that would foster multi-cultural understanding, exploration of international studies and global cultures, and the study of languages.
(b) A program such as the one described for the Complex would serve as a model for providing students with an "internationally competitive" education.
(c) The cultural resources of the area (e.g., Quapaw Quarter, Dunbar Alumni Association, UALR International Visitor Center, Arts Center, etc.) would enrich the international studies program.
(d) Programs in these schools appear to have a good possibility of meeting the three objectives of magnet schools as stated by the Court, i.e., to provide quality education, serve as a tool for achieving integration, and attract white students back to the Little Rock School District.
(e) The Complex could host contests, exhibits, and cultural events for other students throughout the State and could serve as a model program for other districts.
Attachment C, page 33, visually displays the MRC's proposal for interdistrict magnet school programs.

H. Governance

The Magnet Review Committee recommends that the day-to-day operations of magnet schools be the responsibility of the host school district.

I. Extended Day Care

The Magnet Review Committee recommends that self-supporting extended day care services be available for students at each of the interdistrict magnet schools.
A substantial number of parents living in the metropolitan area drive long distances to work each day. The Committee believes that the availability of extended day care services will substantially enhance the desegregative effects of the magnet schools.
The cost associated with the extended day care services shall not be included in the operating costs of the magnet schools.

ATTACHMENT A

FACILITIES REPORT CONSTRUCTION/RENOVATION

 LRSD STATE BUILDING SERVICES REVISED
BUILDING ESTIMATE REPORT ESTIMATE
_____________________________________________________________________________
Carver $ 2,420,000 Deduct $350,000 for land purchase
 $ 2,070,000 12% too much contingency
 ($248,400) $1,821,600.00

*380
 LRSD STATE BUILDINGS SERVICES REVISED
BUILDING ESTIMATE REPORT ESTIMATE
_______________________________________________________________________
Booker $ 916,000 8% too much contingency
 ($73,280) $ 842,720.00
Mann $ 2,511,400 9% too much contingency
 ($226,026) $2,285,374.00
Williams None
Dunbar $ 1,220,000 20% too much contingency
 ($244,000) $ 976,000.00
Gibbs $ 605,800 5% too much contingency
 ($30,290) $ 575,510.00
 TOTAL $6,501,204.00
 STATE'S PORTION $3,250,602.00

ATTACHMENT B

MFPA CALCULATIONS UNDER ACT 34

(SCHOOL FINANCE ACT)
RESOURCES:
1. Real property assessment times 19 mills (.019).
2. Personal property assessment (year before base year) times current revenue divided by base year revenue times 45 mills (.045).
3. Utility assessment (year before base year) times current revenue divided by base year revenue times 45 mills (.045).
4. Seventy-five (75) percent of miscellaneous revenue.
5. Masters' degree credit.
Calculations:
6. 1 + 2 + 3 + 4 - 5 = Resources
7. Resources divided by WADM = Resource Rate
8. State Base Equalization Rate minus Resource Rate = Table Rate
9. Table Rate times WADM = MFPA
(Minimum Foundation Program Aid)

 MAGNET SCHOOLS
 BASE DATA
Magnet School Students Total 3,722
Little Rock (25% shadow) 931}
 plus 43% of 2791 1200} 2,131
Pulaski County  40% of 2791 1,116
North Little Rock  17% of
2791 475
 TOTAL EXPENSE[*]
 BUDGET 86-87 ADM EXP/ADM +12%[**]
Little Rock $49,510,543 19116 $2,590.01 $2,900.81
North Little Rock $24,633,000 9419 $2,615.25
Pulaski County $69,057,078 30015 $2,300.75

*381
 State Base Equalization Rate = $1,687.02
 Table Rates (State Aid per Student):
 Little Rock $ 635.86
 North Little Rock $ 986.04
 Pulaski County $1,136.17

LITTLE ROCK

Magnet School Expense Per Student $2,900.81
Expense for Regular Student $2,590.01
Number of Magnet School Students 2131
State Aid per Student (Table Rate) $ 635.86

The State will pay one half of the expense of the Magnet Schools plus the State Aid.
$2,900.81 divided by 2 = $1,450.41 State's share
$1.450.41 - $635.85 = $814.55 Cost per student for a Little Rock student.
$814.55 × 2,131 = $1,735.806 Little Rock's costs for magnet students.
Little Rock's expense for a regular student is $2,590.01.
$2,590.01 less $1,687.02 (State Base Equalization Rate) = $902.99 Expenditure per regular student.
$902.99 (available funds for each student) less $814.55 = $88.44 Excess funds per magnet student over and above Little Rock's cost.
$88.44 × 2131 = $188,466 Total incentive savings for Magnet participation

NORTH LITTLE ROCK

Magnet School Expense Per Student $2,900.81
Expense for Regular Student (North
Little Rock) $2,615.25
State Aid Per Student (Table Rate) $ 986.04
Number of Magnet School Students 475

The State will pay one half of the expense of the Magnet Schools plus the State Aid. $2,900.81 divided by 2 = $1,450.41 State's share.
$1,450.41 - $986.04 = $464.37 Cost per student for a North Little Rock student.
$464.37 × 475 = $220,576 North Little Rock's cost for magnet school students.
North Little Rock's expense for a regular student is $2,615.25.
$2,615.25 less $1,687.02 (State Base Equalization Rate) = $928.23 Expenditure per Regular student.
$928.23 (available funds for each student) less $464.37 = $463.86 Excess funds per magnet student over and above North Little Rock's cost.
$463.86 × 475 = $220,334 Total incentive savings for magnet participation.

PULASKI COUNTY

Magnet School Expense per Student $2,900.81
Expense for Regular Student (Pulaski
County) $2,300.75
State Aid per Student (Table Rate) $1,136.17
Number of Magnet School Students 1116

The State will pay one half of the expense of the Magnet Schools plus the State Aid.
$2,900.81 divided by 2 = $1,450.41 State share.
$1,450.41 - $1,136.17 = $314.24 Cost per student for a Pulaski County Student.
$314.24 × 1116 = $350,692 Pulaski County's cost for magnet school students.
Pulaski County's expense for a regular student is $2,300.75.
$2,300.75 less $1,687.02 (State Base Equalization Rate) = $613.73 Expenditure per regular student.
$613.73 (available funds for each student) less $314.24 = $299.49 Excess funds per magnet student over and above Pulaski County's cost.
$299.49 × 1116 = $334,231 Total incentive savings for magnet participation.

*382 SUMMARY OF MAGNET SCHOOL COSTS

Total number of students  3,722

Total Cost of Magnet Students 

$2,900.81 × 3,722 = $10,796,815

State will pay a total of $8,489,760[*]

Districts will pay a total of $2,307,055

ATTACHMENT C

PROPOSAL FOR MAGNET SCHOOL PROGRAMS

 ESTIMATED
 STUDENT RECOMMENDED BUILDING
SCHOOL CAPACITY THEMES RENOVATION COSTS
---------------------------------------------------------------------------
Williams 432 Basic Skills None
Booker 478 Fine Arts $ 842,720
Mann 1,194 Arts & Sciences $2,285,374
Carver 478 Math & Science;
 Basic Skills $1,821,600
Dunbar 792 International Studies;
 Global Cultures $ 976,000
Gibbs 348 International Studies;
 Global Cultures $ 575,510
 __________
 TOTAL STUDENTS 3,722 TOTAL COST $6,501,204
 __________
 STATE'S PORTION $3,250,602

EXHIBIT C

KAPLAN, BREWER & MILLER, P.A.

ATTORNEYS AT LAW
February 23, 1987
Honorable Henry Woods
U.S. District Court Judge
P.O. Box 3683
Little Rock, Arkansas 72203
HAND DELIVERED
Re: Little Rock School District v. Pulaski
 County School District, et al.
Dear Judge Woods:
Last week when the parties presented their magnet school stipulation, I added four specific items which I dictated into the record. The purpose of this letter is formally to make these items a part of the stipulation, and to include them within the agreement of the parties. Those items are:
1. Little Rock School District commits to the appointment at each of the magnet schools of a contact person who will be responsible for adjustment problems for all transfer students.
2. Little Rock School District commits to a tight implementation schedule. Pursuant to that end, Little Rock School District will, within four weeks of the *383 date of the execution of the magnet school stipulation present a budget for submission to all of the other parties and will submit a timeline for full implementation and opening of the magnet schools.
3. The parties agree to the concept of grade level continuity within the magnet school program.
4. Each of the parties agrees to appoint their members of the MET by the end of the week beginning February 23rd. PCSSD may require a few more days but will promptly appoint its members. The parties agree that the recruitment effort is critical to the success of the magnet program and that each is committed to pursuing agressively the recruitment effort.
The parties wish to have these items included in the magnet school stipulation.
Sincerely,
/s/ Philip E. Kaplan
Philip E. Kaplan
PEK/alh

EXHIBIT D

STIPULATION FOR PROPOSED ORDER ON VOLUNTARY MAJORITY TO MINORITY TRANSFERS
Plaintiff Little Rock School District ("LRSD"), and defendants Pulaski County Special School District ("PCSSD"), North Little Rock School District ("NLRSD"), and Arkansas State Board of Education ("State Board"), being in agreement on the voluntary majority-to-minority transfers, submit the following stipulations for the proposed order:
1. Beginning in the 1987-88 school year and continuing thereafter, LRSD, PCSSD and NLRSD will permit and encourage voluntary majority-to-minority interdistrict transfers. The three districts will cooperate in the development of programs to acquaint parents, guardians and students with interdistrict opportunities. The implementation of majority-to-minority transfer provisions is contingent upon the implementation of all other provisions of the remedy ordered by the Court.
2. Eligibility:
a. Black students who are members of the racial majority at a school in any participating district which district is 50 percent or more black in its enrollment shall be eligible to transfer voluntarily to a school and district in any other participating district in which school and district they would be in the racial minority.
b. White students who are members of the racial majority at a school in a participating district which district is more than 50% white in its enrollment shall be eligible to transfer voluntarily to a school and district in any other participating district in which they would be in the racial minority.
c. Prior to the transfer of any student, the home district shall issue a statement that the transferring student is in good standing. If the student is not in good standing, the student may be permitted to transfer on a provisional basis.
3. Students wishing to transfer shall file applications with their home districts. Applications must be filed before May 1 of the preceding school year and a student may not transfer more than once in any school year. The home district will process all applications and forward copies to the host districts. The home district will furnish its complete file on each student with his/her application.
4. Transfer assignments will be made subject to availability of space in schools and grade levels, and the host districts' ability to comply with state standards.
5. The host district shall honor the placement for the students as certified by the home district, which shall be communicated to the parent or guardian prior to transfer. If, during the first semester, testing, performance, remedial efforts, and consultation indicate that an adjustment of *384 placement should be made, it shall be made after the first semester in consultation with the student's parent or guardian.
6. The commitment to accept a student shall be for the duration of the student's voluntary participation. Once a student exercises his or her right to participate, the student will continue in the initially selected school for at least one full school year or until the student graduates or affirmatively withdraws from participation as herein set out. Students will not have to transfer each year or exercise a transfer choice to remain in the host district. Students shall be encouraged to continue to participate at their initial school of choice. It is expected that the student will follow the pattern of assigned schools for the resident students in the school in which the transfer student first enrolls.
7. Students who have elected to transfer shall remain students of the host district until they choose to return to the district where they reside.
8. Host districts shall not have the authority to remand transfer students to the home district. Host districts shall have the authority to discipline, suspend or expel a transfer student using the same due process procedures applicable to resident students.
9. Once admitted, transfer students will be expected to meet the same general standards, academic and other, as applied to students of the host district.
10. Information about each district's academic and disciplinary policies and procedures will be made available to prospective transfer students on request. This should include information on pupil-teacher ratios, promotion and retention, counseling assistance, grading, student code of conduct, disciplinary action, and suspension and expulsion.
11. The host district shall respond to the educational needs of students without regard to their status as a transfer or resident student. Transfer students shall be eligible and encouraged to participate in all school programs funded and sponsored by the host district (academic, athletic, extra-curricular and other) and shall not suffer any disability or ineligibility because they are voluntary interdistrict transfer students. Participation in after-school activities will be facilitated by the provision where needed of extra-curricular buses or other forms of transportation which will be available to all such transfer students, the cost of which shall be borne by the State as provided in paragraph 12.
12. The State Board shall pay the full cost of transporting students opting for interdistrict transfers. However, the State Board shall have the option of (1) paying the school districts for transporting the students or (2) contracting for the services or (3) transporting the students with a state operated system.
13. The State Board shall pay the home and host districts in accordance with the following procedures:
a. Each year school districts shall calculate and certify to the State Board of Education their cost per student in regular schools (grades K-12) including all add-ons for special education, TAG, vocational education and other purposes. The cost per student shall include all costs for instruction and support services minus student transportation, food service, and restricted federal program costs. (To the extent that the host district does not receive pro-rata increases in restricted federal program costs by hosting transfer students who are eligible to participate in federal programs, the cost per student shall be increased on a pro-rata basis for such transfer students.) The State shall pay the costs for full-time equivalent students who have been transferred to the host district. Payments made for the current year shall be based on costs for the previous year. The host district shall report each transfer student on forms as required by the State Department of Education.

*385 b. Each host district shall estimate the full-time equivalent of transfer students and transmit such estimate, along with the names of the students, to the State in September of each year when payment begins. A correction will be made in January of each year. Payments shall be made by the State monthly through forward funding to each district based upon the September estimate as corrected. The students transferred to the host district shall not be counted in the number used to calculate regular state aid for the district.
c. Each home district shall receive from the State for each student who voluntarily transfers from his/her home district to a host district one-half of the State aid (table rate) it would have received had the student remained in his/her home district. Information about these students shall be reported on forms as required by the State Department of Education and shall be reported at the same time as the reports are made by the host district. The students transferred from the home district shall not be counted in the number used to calculate regular state aid for the home district. All transfers of handicapped students shall be contingent on the availability of appropriate programs and resources, as identified in the IEP, at the host school.
d. The provisions contained herein do not apply to magnet schools and programs.
14. All parties to this stipulation recognize that the present racial balance of the North Little Rock School District approximates that of the entire county and they are desirous of not upsetting that balance through the operation of the Majority to Minority Transfer Program.
The parties further recognize that any court approved student assignment plan by any party could be compromised if the Majority to Minority Transfer Program caused significant changes in student assignment plans. To avoid this result, all parties agree that any party may choose to include or not include said Majority to Minority transfer students for purposes of student assignment under any court order.
Further, all parties recognize that substantial participation in the Majority to Minority program could have the result of creating technical departures from targeted student ratios at one or more schools. All parties agree that any such departure resulting from the lawful operation of the Majority to Minority program shall not give rise to a claim or contention that such departure from targeted ratios constitute violations of any law or regulation and, specifically, shall never be urged or suggested as grounds for liability in this or similar litigation.
Additionally, any such resulting departures from targeted ratios shall not require the districts affected to reconstitute or recompose the student body of any affected school.
Agreed this 26th day of August, 1986.
PULASKI COUNTY SPECIAL SCHOOL LITTLE ROCK SCHOOL DISTRICT
DISTRICT
By /s/ M. Samuel Jones By /s/ P. A. Hollingsworth 
NORTH LITTLE ROCK SCHOOL DISTRICT ARKANSAS STATE BOARD OF
 EDUCATION
By /s/ Philip K. Lyon By /s/ C. R. McNair 
2258L

*386 EXHIBIT E

STIPULATION OF THE LITTLE ROCK SCHOOL DISTRICT, THE PULASKI COUNTY SPECIAL SCHOOL DISTRICT, AND THE NORTH LITTLE ROCK SCHOOL DISTRICT FOR THE CREATION OF A PULASKI COUNTY EDUCATIONAL COOPERATIVE
1. The State currently funds fifteen (15) regional educational cooperatives to provide service to school districts within identified geographic areas. Staff development, distribution of audio visual resources, "teacher center" activities, and purchasing are among the services currently being provided.
2. The three (3) school districts in this litigation were instructed by the Eighth Circuit Court of Appeals to explore cooperative programs. Little Rock School District v. Pulaski County Special School District, 778 F.2d 404, 436 [8th Cir.1985].
3. The parties agree that an educational cooperative should be formed and modeled after the fifteen (15) other regional cooperatives; and funded by the State in the same manner as the existing cooperatives. The name of the cooperative should be Pulaski County Educational Cooperative.
4. The parties to the stipulation agree the creation of interdistrict magnet schools, M to M transfers, and interdistrict transportation systems increase the need for cooperation and provides new avenues for further cooperative ventures. The opportunity to participate in cooperative ventures would strengthen each district's ability to provide an equitable and effective educational program for its students.
5. An interdistrict venture of this type would facilitate each district's desegregation efforts and would aid the avoidance of unanticipated effects of one district's plan on the plans of the other districts.
6. The parties agree that, within the structure of the educational cooperative, they will explore the possibility of cooperative efforts of mutual benefit. These will include, but will not be limited to, discussing the possible cooperative efforts listed by the Court of Appeals in its opinion, LRSD v. PCSSD, 778 F.2d 404, 430-31 (8th Cir.1985).
7. The governing body of the cooperative will be comprised of the Superintendents of the member school districts.
Respectfully submitted,
 KAPLAN, BREWER & MILLER, P.A.
 415 Main Street
 Little Rock, AR 72201
 (501) 372-0400
 HOLLINGSWORTH & HELLER, P.A.
 415 Main Street
 Little Rock, AR 72201
 (501) 374-3420
 JOHN M. BILHEIMER
 324 West 14th Street
 Little Rock, AR 72202
 (501) 374-4944
 PULLIAM LAW OFFICES, P.A.
 Suite 350, Gazette Building
 112 West Third Street
 Little Rock, AR 72201
 (501) 371-3888
 By: /s/ Janet L. Pulliam
 JANET L. PULLIAM
 Attorneys for Little Rock School
 District
 NEAL, GERBER & EISENBERG
 208 S. LaSalle Street
 Chicago, IL 60604
 WRIGHT, LINDSEY & JENNINGS
 2200 Worthen Bank Building
 Little Rock, AR 72201
 By: /s/ M. Samuel Jones
 M. SAMUEL JONES
 Attorneys for Pulaski County
 Special School District
 JACK, LYON & JONES, P.A.
 3400 Capitol Tower
 Capitol at Broadway
 Little Rock, AR 72201
 (501) 375-1122
 By: /s/ Stephen W. Jones
 STEPHEN W. JONES
 Attorneys for North Little Rock
 School District
 TED SHAW, ESQUIRE
 Legal Defense Fund
 99 Hudson Street
 New York, NY 10013
*387
 JOHN W. WALKER, P.A.
 1723 Broadway
 Little Rock, AR 72206
 By: /s/ Theodore M. Shaw
 Attorneys for Joshua Intervenors
NOTES
[*] Does not include transportation costs
[**] 12% has been added to the Little Rock expense per ADM for estimated increased operation costs for magnet schools within the Little Rock School District.
[*] Note that Customary State Aid is included in this figure. Cost to the State in excess of customary State Aid $2,210,672.